UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
|
SECURITIES AND EXCHANGE )
COMMISSION, )
)
            Plaintiff, )      Civil Action No. 13cv3114PKC
)      ECF CASE
    v. )
)
SUBAYE, INC.,  and )      JURY TRIAL DEMANDED
JAMES T. CRANE, )
)
           Defendants, )
_____)

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following against defendants Subaye, Inc.  ("Subaye"), and James T. Crane ("Crane")  (collectively, "Defendants"):

## SUMMARY

1.      This case involves a securities fraud perpetrated by Subaye, a China-based company whose stock trades in the United States, and its former Chief Financial Officer, James Crane.  During at least 2010-2011, Subaye and Crane engaged in a fraudulent scheme involving misrepresentations about the company's business and operations, deceiving the company's auditors and misleading investors about the company's true status and revenues.

2.      Subaye is a company based in the People's Republic of China whose stock is registered with the Commission and trades in the United States.  During the time at issue, the stock traded on the NASDAQ Stock Market ("NASDAQ").  Through its public filings and announcements, Subaye repeatedly made misrepresentations to prospective investors, to

NASDAQ, and to the Commission.  Among other things, Subaye falsely promoted itself as an up-and-coming company with a bright future, millions of dollars in revenue, and vibrant business operations.  Seeking access to the U.S. capital markets, Subaye described itself in a variety of different ways, each focused on providing media or internet-based services to Chinese businesses. Annual filings with the S.E.C. purported to show a company that, through different business models, was continuously growing, whether that growth was measured in revenues or number of employees.

3.      In retrospect, there were signs that the company was not what it held itself out to be.  For one, the company's claimed business kept changing.  Initially, in 2008 through late 2010, the company claimed to provide video advertising and entertainment media services to small-to-medium businesses in China.  According to Subaye's public descriptions, it provided its customers with an online platform on which they could design their own advertising content.  But by September, 2010, Subaye claimed to be discontinuing this business and shifting instead to a cloud computing model.  This new business was supposed to combine online video and cloud computing services.

4.      Another sign was Subaye's claims, in filings with the Commission, of rapid growth, both in sales and operations, despite the shifting business model.  The company claimed in 2010 to have over 1,400 sales and marketing employees.  Its reported revenues were $39 million for its 2010 fiscal year, and it projected revenues of more than $71 million for 2011, a year in which it was planning to discontinue one business and shift into another.

5.      And then there was the vanishing money.  In Subaye's 2010 year-end filing, the company expensed $22 million – equal to more than half of its reported revenues for the year – as "marketing expenses."  This write-off was explained by Crane as a "strategic decision" to invest

in marketing to new markets.  In truth, however, it was questions from Subaye's auditors – questions like, where are the bank accounts?  Do you have control over this money? – that had forced the company to reclassify the money, formerly claimed as "cash held in trust," as "marketing expenses."

6.      But it was Subaye's retention of a new auditor in December 2010 that started to crack the façade.  At that point, Subaye retained PricewaterhouseCoopers Hong Kong ("PwC HK") as its independent auditor, a move intended to signal to the market that it was poised to continue its rapid growth.

7.      Instead, PwC HK started to ask questions.  Those questions – could the company show an entitlement to revenues it claimed to have?  Who were its customers?  Where was the support for the marketing expenses? -- were never answered by Subaye.  Instead, in short order, first Crane, and then PwC HK, resigned.  The company was threatened with delisting by NASDAQ and, in desperation, turned to a new CEO, Alexander Holtermann ("Holtermann") to try to bring the company into NASDAQ compliance.  But Holtermann could not get answers from management to NASDAQ's and PwC HK's questions.

8.      On May 12, 2011, Holtermann, now in China, went to Subaye's headquarters to take stock.  The office to which he was directed by the company's former President was located in a university building, among student offices.  Through the closed doors, Holtermann heard nothing.  His knocks went unanswered.  Students working in nearby offices reported that the offices had been cleared out the day before, and Holtermann's view through an outside window seemed to confirm this.  After considerable effort to try to identify company documents, assets, customers, and employees, Holtermann found himself with approximately $200,000 and a box of documents.  He was told this was all that remained of Subaye.  Subaye had no verifiable revenues

to back up its claims of customers; the people it claimed as customers had no such relationship to the company; and it lacked the infrastructure to support its claimed cloud computing services. Instead, with the support of its Chief Financial Officer Crane, Subaye had presented the world with an imaginary business. The multi-million-dollar company Holtermann had been recruited to run appeared not to exist.

9.      By engaging in the conduct alleged herein, Subaye violated Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act of 1934 ("Exchange Act") and Rules 10b-5, 12b-20, 13a-1 and 13a-11 thereunder.

10.      By engaging in the conduct alleged herein, Crane violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5, 13a-14, 13b2-1 and 13b2-2 thereunder, and Section 105(c)(7)(B) of the Sarbanes-Oxley Act of 2002, and aided and abetted Subaye's violations of Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, and 13a-11 thereunder.

11.      Based on these violations, the Commission seeks: (1) entry of a permanent injunction prohibiting the Defendants from further violations of the relevant provisions of the federal securities laws; (2) disgorgement of Crane's ill-gotten gains, plus pre-judgment interest; (3) the imposition of a civil monetary penalty on Crane due to the egregious nature of the violations; (4) the imposition of an officer and director bar against defendant Crane; and (5) such other and further relief as the Court deems just and proper.

## JURISDICTION AND VENUE

12.     The Commission brings this action pursuant to the enforcement authority conferred upon it by Section 21(d) of the Exchange Act [15 U.S.C. §§78u(d)], and Section 3(b) of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7202(b)].

13.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), and 78aa], and Section 3(b) of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7202(b)].

14.     Venue is proper in this district pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa], because certain acts, practices, transactions and courses of business constituting the violations occurred in the Southern District of New York.  Subaye's common stock traded on the NASDAQ under the ticker symbol "SBAY."

15.     In connection with the conduct alleged in this Complaint, the Defendants directly or indirectly made use of the means or instruments of transportation or communication in interstate commerce, the facilities of a national securities exchange, or the mails.

16.     The Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

17.     Unless enjoined, the Defendants will continue to engage in the securities law violations alleged herein, or in similar conduct that would violate the federal securities laws.

## DEFENDANTS

18.     Subaye is a Delaware-incorporated company that claimed to have primary operations in the People's Republic of China.  Subaye is a public company whose stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act.  It was required to

file certain periodic and other reports with the Commission, including audited financial statements. Subaye claimed to be a leading online services provider for small-to-medium-sized businesses in China. Subaye's stock trades publicly in the United States. Subaye was listed on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "SBAY" from March 15, 2010, until November 11, 2011. Subaye currently trades on the over-the-counter ("OTC") markets.

19.     James Crane, age 36, was the Chief Financial Officer of Subaye from October 29, 2007, until March 10, 2011. Crane was a Massachusetts-licensed CPA who founded J. Crane CPA, P.C. (also known as J. Crane and Company), a Cambridge, Massachusetts accounting firm formerly registered with the Public Company Accounting Oversight Board ("PCAOB"). While Crane was Subaye's CFO, he also claimed to hold several senior executive and director positions with about a dozen other companies, including serving as CFO of some and President of others. While Crane was Subaye's CFO, he claimed to be living in China. On information and belief, Crane now resides in southern California.

## FACTUAL ALLEGATIONS

### A.  The public face of Subaye.

20.     Subaye was a public company, subject to the SEC's requirements for periodic filings. Subaye filed annual and quarterly reports describing its business; those reports were drafted and signed by Crane. In connection with those requirements, Subaye retained an independent auditor to conduct annual audits and quarterly reviews of its financial statements. Until late 2010, that firm was DNTW Chartered Accountants, LLP ("DNTW"). The DNTW auditors relied on Crane for the information they needed for their audits. As far as DNTW was aware, Crane was the only Subaye employee who spoke fluent English. The auditors addressed

their audit-related questions to Crane and received responses from Crane.  For Subaye's 2008, 2009, and 2010 SEC filings, DNTW's audits relied almost entirely on information and representations from Crane.

21.     According to DNTW, the descriptions of Subaye's business that appeared in the company's SEC filings were provided by Crane.  Those descriptions reflected a company that seemed to keep reinventing itself.  For example, in its 2008 Form 10-K filed with the SEC, Subaye (then known as MyStarU.com, Inc.) described "five distinct business segments" in which the company operated.  These were (1) investments in entertainment arts productions, (2) online membership services, (3) software sales (providing web-based and mobile software platforms), (4) importing and exporting goods, and (5) product placement in the Chinese entertainment arts industry.

22.     In that Form 10-K, Subaye claimed that its majority-owned subsidiary, Subaye.com, whose website was at www.subaye.com, served as a "premier provider of online video in China."  According to that filing, the company's total revenue was over $29 million, online members were charged about $100 monthly, and "Subaye.com had 34,545 members."

23.     For 2009, the public filings painted a similar picture, but with a new twist.  The company (now called Subaye, Inc.) claimed in its 2009 Form 10-K to be developing "what Subaye believes is the first online shopping mall in the world that will utilize 3D imaging throughout the online customer interface."   Subaye's reported revenue for that fiscal year was just under $48 million, and Subaye claimed it had 63,311 members.

24.     Subaye's filings with the Commission showed a growing company with strong fundamentals:

| Revenue sources (in millions) | 2010 | 2009 | 2008 |
|---|---|---|---|
| Online video | $ 24.8 | $ 26.7 | $ 9.5 |
| Cloud Product (pre-9/1/10) | 7.4 | - | - |
| Bundled Cloud Product (after 9/1/10) | 6.9 | - | - |
| **Total Revenues** | **$ 39.1** | **$ 26.7** | **$9.5** |
| Customers[1] | 13,531 | 43,838 | 32,366 |
| Cash | $7.1 | $0.3 | $0.3 |
| Employees | 1,539 | 311 | 189 |

25.     For each of these years, Crane was the CFO.  For each of these years, Crane certified to the company's auditors and in the SEC filings that he had reviewed the company's Form 10-K filed with the SEC and that, based on his knowledge, it did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.  He further certified that, based on his knowledge, the financial statements and other financial information contained in each report fairly presented in all material respects the financial condition, results of operations and cash flows of Subaye.

**B.  An abrupt about-face.**

26.     In 2010, statements in the Form 10-K—again, drafted, signed and certified by Crane -- appeared to show a company that had morphed again, now "fully committed to one business model focused entirely on the second generation cloud computing product[.]"   The

---

[1] Defined as paying "members" of the company's internet video services or bundled cloud product.  Subaye attributed the decline in customers from 2009 to 2010 to the change in moving to the bundled cloud product on September 1, 2010.  In January of 2011, Subaye claimed that its bundled cloud paying customers had increased to nearly 14,600 as of December 2010.

company disclosed in its Form 10-K that it "no longer offer[ed] Online Video as a separate

product." Instead, online video was to be offered only as a part of a "bundled" cloud computing

product. This shift came despite the company's claims that, for its fiscal year ending September

30, 2010, its revenues from the online video business had been $24.8 million, while the

company's two cloud products combined had generated only $14.3 million. Nonetheless, Subaye

claimed to be abandoning its highest revenue product line. Presumably to make up the expected

shortfall, Subaye stated that, "as of September 1, 2010, we began charging our customers

approximately $410 per month for access to the Bundled Cloud Product," more than three times

the monthly fee charged during the prior fiscal year.

27. According to what Subaye told its auditors, DNTW, these monthly fees were

collected by sales agents, who visited Subaye's customers and collected the fees in cash. The

cash would supposedly then be remitted to Subaye after commissions and other expenses were

deducted by the sales agents.

28. Subaye claimed to have an employee sales force that was growing just as fast as

the rest of its business. The 2010 Form 10-K stated that Subaye had "recently completed an

aggressive expansion of our internal sales force and will look to further increase the size of our

sales force in order to meet the demands of the various specific markets in China that we now

operate in." Subaye claimed that, as of September 30, 2010, it had 1,405 sales and marketing

employees, up from 212 for the same date the prior year.

29. In January 2011, Crane filed an Amended Form 8-K/A with the SEC. The form

attached a presentation that, according to Crane, had been prepared for an investor conference in

late January. Crane attended that conference in Florida and made a presentation to potential

investors. That presentation repeated claims from the 2010 Form 10-K, including those about its

revenues, number of employees, and marketing expenses.  Subaye also claimed in its January 2011 filing that the company had more than 14,600 customers for its bundled cloud product as of December 2010 and projected revenues of $71.3 million for fiscal 2011.

### C.   Cracks in the Facade.

#### 1.   Subaye Hires PricewaterhouseCoopers.

30.     On December 23, 2010, the day it filed its Form 10-K for 2010 with the Commission, Subaye dismissed DNTW, the Canadian firm that had audited its financial statements for the past few years.  The company announced in a press release that it had instead hired PricewaterhouseCoopers Hong Kong ("PwC HK") to serve as its auditor, "because we realize U.S. investors are increasingly focused on the quality of a company's auditor and many investors told us they perceived Pricewaterhousecoopers to be a stronger auditor."  This change began a series of events that would ultimate expose Subaye's fraud.

#### 2.   Millions expensed as "marketing expenses."

31.     In that same press release, on December 23, 2010, Crane downplayed the significance of a $22 million marketing expense – equal to more than half of the company's reported revenues for the year --reported in the company's 2010 Form 10-K.  He claimed that, in the fourth quarter of 2010, "we made the strategic decision to dramatically increase our marketing expenses in new markets because we wanted to capitalize on the tremendous growth opportunities available to us. . . . Unfortunately, GAAP accounting requires us to expense the entire $22.1 million even though very little of the money had actually been spent by our marketing agents as of September 30, 2010."

32.     In reality, the story of the $22 million marketing expense was much messier.  During the fourth quarter of 2010, Subaye had recorded an $18.8 million asset called "Cash Held

in Trust" on its balance sheet.  (This asset was equal to about half of the company's reported total revenues for the year.)  In discussions with DNTW, the company's auditors, Crane claimed that the cash was being held by Subaye's third-party sales agents to be used for marketing and promotional expenses, as directed by the company.  In other words, Crane claimed that the sales agents had collected money from Subaye's customers and then, rather than passing the funds on to Subaye, had kept the money for future marketing and promotional expenses.  During the 2010 audit, Subaye provided DNTW with general ledger and journal entries showing funds recorded as "development" in various provinces, with an offset to accounts receivable from third party sales agents[2].  But when DNTW asked for documents to support the existence of this cash, said to be held by sales agents for development, Crane could not produce any bank account statements, receipts, or other direct proof.  Instead, Crane produced contracts, said to have been signed by the third-party sales agents, purporting to show a relationship between them and Subaye.  The auditors asked questions designed to corroborate the existence of the cash and Subaye's control over it.  In response, Crane emailed, "There is no control over the bank accounts.  This is something I suggested they do but confirmed yesterday that it was not agreed to by the agents."

33.     Crane then conceded to DNTW that, under the circumstances, "we can not call this cash."  He suggested that, "'advances to third party agents for business development' or some wording like that will be ok."

34.     Ultimately, Subaye agreed to expense the $18.8 million as a portion of claimed "marketing promotions" in its 2010 Form 10-K.  The company reported in that filing that it had "provided many of the [customer relations agents] with significant operating capital to conduct

---

[2] The "development" entries were later reclassified as "Cash Held In Trust" for the first draft of the financial statements that Crane provided to DNTW.

their business development activities" during 2010.  But it provided no evidence that the cash had ever existed, nor that it had been given to the agents.

35.     The prior year's Form 10-K had contained similar representations.  Subaye's audited financial statements reported "Deposits for Purchase of Inventoriable Assets" as an asset on its balance sheet beginning in 2009.  In its 2009 Form 10-K, Subaye reported $8.1 million in this category – an amount equal to about 17% of its revenues for the year, or 25 times the company's cash balance at the end of the year.  Crane represented to DNTW that the deposits were related to Subaye's future launch of its online 3D mall, and that their purpose was to allow Subaye to be able to sell and ship goods through its site, rather than having the site function only as a showplace.  As DNTW understood it, the money was to be used to make sure that Subaye had access to goods, including jewelry and clothing, once the 3-D mall was operational.

36.     By the fourth quarter of 2010, after a series of write-offs and a purported refund, the $8.1 million in deposits had been reduced to $2.8 million on Subaye's books.  Although Crane had initially taken the position that the deposits were 100% refundable, by the end of the 2010 fiscal year two of the contracts had been canceled, $3.4 million had been written off, and Subaye claimed to have been refunded only $1.9 million of the $8.1 million.  As the company attempted to explain in its 2010 Form 10-K, "During the year ended September 30, 2009, we paid deposits of $8.1 million to three manufacturers in connection with inventory supply agreements.  The inventory supply agreements were negotiated with the intent of using high volume price discounts in order to supply our potential online mall customers with low price inventory.  The supply agreements were renegotiated in June 2010 and approximately $1.9 million of our original deposits were refunded to us.  We are unsure if the remainder of the deposits will ever be recovered or if inventory will ever be delivered from the manufacturers.  As a result, we have

recorded a full reserve for the balance of the deposits as of September 30, 2010." At DNTW's insistence, Subaye agreed to expense the remaining $2.8 million in this 2010 Form 10-K.

37. Like the scheme described above, this financial sleight of hand was a way for Subaye to try to explain why its reportedly growing revenues were not resulting in a growing cash account. The company went from a claim of $8.1 million in future inventory to a claim of only $1.9 million in cash, without any inventory or other assets to show for the shortfall.

38. Despite determining in 2010 that the contracts had no refund provisions, and that Subaye had never had any claim to the assets, Subaye never restated (to correct the inaccurate accounting figures) in subsequent SEC filings its claimed 2009 asset balance of $8.1 million in deposits.

39. Both the "marketing expenses" and "deposits" were attempts by Subaye to mask the true nature of the sham company. By claiming to have "reinvested" its revenues, Subaye avoided revealing that its online membership services were not generating these sums of cash. As the company's fake revenues grew, though, so did the size of the cover needed to hide the fraud.

### 3.     Crane is sanctioned by the PCAOB.

40. On January 19, 2011, the Public Company Accounting Oversight Board ("PCAOB") filed a settled action against Crane and his audit firm, J. Crane CPA, P.C. The action resulted from the PCAOB's efforts to inspect Crane's firm, which were unsuccessful, as well as J. Crane CPA, P.C.'s failure to file required reports and pay annual fees. Crane (and his company) agreed to settle the claims without admitting or denying the conduct, and agreed to entry of an order permanently revoking J. Crane CPA, P.C.'s registration and barring Crane from being an associated person of a registered public accounting firm.

41.     Crane was informed that he was forbidden by law from being an associated person of a registered accounting firm, or being associated with any issuer of U.S. registered stock in a financial management or accounting capacity.  In response, Crane sought permission from the PCAOB to remain as Subaye's CFO for two more months.  The PCAOB denied this request.

42.     Crane neither sought nor received the SEC's consent to continue as Subaye's CFO following the issuance of the PCAOB order.

43.     In violation of the PCAOB order, Crane remained Subaye's CFO until March 10, 2011, when he resigned to "pursue other professional interests."  During the months between his PCAOB sanction and his resignation, Crane played an active role in the company's accounting and financial management.  On January 26, 2011 – just a week after having been told by the PCAOB that he could no longer serve as Subaye's CFO – Crane signed an amended Form 8-K/A filed by Subaye with the SEC.  The day before the filing, Crane had appeared before investors at an "Undiscovered Equities" event in Florida, promoting Subaye.

### 4.     PwC HK resigns.

44.     PwC HK began its engagement as Subaye's new independent auditor with a review of Subaye's financials in January 2011.  By early February, Crane was suggesting that PwC HK might need to be replaced.  The audit was much more thorough than Crane was accustomed to, with PwC HK seeking more information from Crane and questioning the work done by Subaye's former auditor, DNTW.

45.     On February 14, 2011, Subaye filed a Form 12b-25 with the SEC.  This form served as a notification that Subaye would be late in filing its quarterly report (Form 10-Q) from the quarter ended December 31, 2010.  This Form 12b-25, which was signed by Crane, claimed that Subaye had been unable to timely file its this Form 10-Q because of "delays in completing

their accounting records." The company cited "ongoing closing procedures, insufficient availability of accounting and administrative staff and the Chinese New Year holidays" as its explanation for the delays. The filing did not mention PwC HK's ongoing scrutiny of Subaye or Crane's concerns about whether the relationship could continue.

46. During its review of the quarterly financials for the quarter ended December 31, 2010, PwC HK identified a series of questions and concerns for which it sought answers from Subaye's management. In communications with Subaye's Audit Committee, PwC HK focused on its inability to obtain information and documentation from Subaye to verify three fundamental aspects of the company's claimed business: (1) cash settlements claimed by the company to have been made from sales agents to Subaye's bank accounts, (2) Subaye's customer base, and (3) Subaye's services rendered to customers. PwC HK also noted that there was inadequate documentation to substantiate marketing and promotion activities that Subaye claimed had been undertaken by sales agents on the company's behalf. Subaye had recorded expenditures related to these activities – more than $22 million -- as expenses after DNTW refused to agree to treat the funds as cash. PwC HK was not satisfied with the support provided for that claim. PwC HK expressed concern that it could not verify the identity of these sales agents, or of Subaye's end customers, or of Subaye's vendors. PwC HK's efforts to perform site visits for three selected sales agents had also been unsuccessful. In short, PwC HK questioned whether Subaye had the business it claimed publicly to have. PwC HK also noted that there appeared to be relationships between and among some of Subaye's customers and vendors, and was not satisfied with the company's explanations for these apparent relationships. Finally, PwC HK noted that there was no evidence that Subaye had paid business tax for services rendered in China.

47.     The relationships discovered by PwC HK were not disclosed in Subaye's prior SEC filings.  PwC HK concluded that

   a.  Tai Kang Corporation Limited ("Tai Kang"), the company acting as Subaye's labor agent, was solely owned by Lishan Deng, who had been serving in an administrative role at Subaye;

   b.  Tai Kang shared the same address as Results Group International ("RGI"), which had previously been granted options to acquire shares of Subaye;

   c.  SSTH, Subaye's largest sales agent (accounting for $22 million of Subaye's reported $26.7 million in revenues for 2009) was formed through a merger between RGI and another company;

   d.  Stareastnet Portal Limited ("Stareastnet"), the company to which Subaye purportedly sold its interests in two subsidiaries, shared an address with Tai Kang;

   e.  Stareastnet purportedly provided internet advertising services to Subaye in 2010;

   f.  Top Rider Group Limited ("Top Rider"), the company to which Subaye purportedly sold its interests in two motion pictures in 2010, shared an address with Tai Kang.

48.     Subaye responded to PwC HK's inquiries about these relationships by reporting that Deng had never been a full-time Subaye employee, and that after her contract expired in December 2010 she would no longer be providing services to the company.

49.     Subaye management further responded that it was common to use the same "business centre" as a mailing address for more than one company, implying that the common addresses did not show any relationship.

50.     On April 1, 2011, PwC HK resigned as Subaye's independent auditors, citing concerns including those listed above.

51.     Subaye attempted to replace PwC HK as its auditor, reaching out to DNTW and to two other firms.  Despite these efforts, no new auditor was retained.

**D.     Subaye's fraud is exposed.**

**1.     Subaye's NASDAQ listing in danger.**

52.     On February 22, 2011, NASDAQ wrote to Crane explaining the consequences of Subaye's failure to file with the SEC its Form 10-Q for the period ended December 31, 2010.  By that letter, Crane was informed that Subaye no longer complied with NASDAQ's listing rules and had 60 calendar days to submit a plan to regain compliance.  The date for that plan to be submitted was set, by letter, at April 25, 2011.  The letter also required that Subaye publicly announce, within four days, that it had received the letter, and that without the announcement, trading in its securities would be halted.

53.     Less than a month after NASDAQ sent this notice, Crane resigned.  No response had been sent to NASDAQ at the time.

54.     The remaining Subaye management, aware that the clock was ticking, sought a replacement for Crane who might answer NASDAQ's concerns: a listing of how many employees the company had, identification and enumeration of the number of sales agents and sales employees, a listing of their largest customers and total sales made to each, an explanation of the suspicious relationships that PwC HK had identified, and many more.

55.     Subaye management turned to Alexander Holtermann ("Holtermann"), a German businessman who had facilitated a transaction for Subaye during 2010.  Subaye offered Holtermann a management role if he could find a new auditor for the company and write a plan for NASDAQ recompliance.  Holtermann took on the tasks, but was unable to get answers from

Subaye management to the questions posed by NASDAQ.  The deadline for submitting a plan for recompliance came and went, and Holtermann, on behalf of Subaye, was unable to respond.

## 2.     A new CEO; the old leadership exits the scene.

56.     After his unsuccessful efforts to preserve Subaye's NASDAQ listing, Holtermann was recruited to replace Subaye's CEO.  On May 12, 2011, Subaye filed a Form 8-K with the SEC announcing that Zhiguang Cai had resigned as CEO and Holtermann had taken his place. The filing was signed by Alan Lun, the company's President.

57.     Days later, Lun also resigned his positions at Subaye.

58.     In early June, 2011, Holtermann made his first visit to Subaye's corporate headquarters.  The address he had been given was in a student building in University City, Guangzhou, China.  In a hall of student offices, Holtermann saw a Subaye sign on the wall between two locked office doors.  He knocked, but got no answer.  He listened at the door and heard no movement.  From an outdoor balcony, Holtermann looked into the office and saw two rooms containing no people and minimal furniture.

59.     In the days before and after his visit to the empty Subaye offices, Holtermann met with Cai and spoke with Lun in efforts to take control of the company's books and bank accounts, and to begin running Subaye.  He also hired a CFO to assist with this process; together, the two attempted to find Subaye's financial records, assets, customers, IT infrastructure, and employees. After weeks of such efforts, Holtermann and the new CFO received a small stack of documents that were said to represent Subaye's entire financial records.  They found no evidence of a cloud computing business or of the 1,000+ employees Subaye had claimed to have.

60.     As part of his efforts, Holtermann identified a database containing what was represented as the company's customer list.  He hired two Chinese speakers to call the people

named on the list and inquire as to their relationship with Subaye. Out of approximately 2,500 names called, only two identified themselves as paying customers of the company.

61.     Based on Subaye's public filings, Holtermann would have expected to find a multi-million dollar company with over a thousand employees, tens of thousands of customers, bank accounts with substantial balances, and computer infrastructure sufficient to support its claimed cloud computing business. Instead, he found an empty student office, a small stack of papers, no bank accounts, very little cash, two paying customers, no employees, no IT infrastructure, and almost no financial records. Holtermann concluded that Subaye was a scam.

**First Claim for Relief**
**(Violation of Section 10(b) of Exchange Act and Rule 10b-5 By Subaye and Crane)**

62.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 61 above as if set forth fully herein.

63.     By reason of the foregoing, Subaye and Crane, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material fact(s) necessary to make the statements made not misleading; or (c) engaged in acts, practices, or courses of business which operated as a fraud or deceit upon certain persons.

64.     By engaging in the conduct described above, Subaye and Crane have violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

**Second Claim for Relief**
**(Violation of Exchange Act  Rule 13b2-1 By Crane)**

65.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 61 above as if set forth fully herein.

66.     Crane admitted to both DNTW and PwC HK that Subaye lacked adequate controls to verify millions in claimed assets, thus acknowledging that he, as Subaye's Chief Financial Officer, failed to implement a system of internal accounting controls.  Crane also falsified the books, records, and accounts of Subaye by providing false information to DNTW about marketing expenses and revenues.

67.     Crane thus circumvented or failed to implement a system of internal accounting controls, and falsified, directly or indirectly, or caused to be falsified, books, records and accounts of Subaye that were subject to Section 13(b)(2)(A) of the Exchange Act, [15 U.S.C. §78m(b)(2)(A)].

68.     As a result, Crane has violated, and unless enjoined will continue to violate, Rule 13b2-1 under the Exchange Act [17 C.F.R. §240.13b2-1].

**Third Claim for Relief**
**(Violation of Exchange Act Rule 13b2-2 By Crane)**

69.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 61 above as if set forth fully herein.

70.     Crane provided false documents concerning agent agreements and bank statements to Subaye's auditors.  He also signed false management representation letters that were provided to Subaye's auditors.

71.     Crane, directly or indirectly, made or caused to be made materially false or misleading statements to Subaye's accountants, or omitted to state or caused another person to omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Subaye's accountants, in connection with the audit of Subaye's financial statements for fiscal year 2010, and the preparation of Form 10-K that were to be filed with the Commission during that fiscal year.

72.     By reason of the foregoing, Crane violated, and unless enjoined will continue to violate, Exchange Act Rule 13b2-2 [17 C.F.R. §240.13b2-2].

**Fourth Claim for Relief**
**(Violation of Exchange Act Rule 13a-14 By Crane)**

73.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 61 above as if set forth fully herein.

74.     On December 22, 2010, Crane signed a false certification of Subaye's Form 10-K. The certification Crane made was pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 and Rule 13a-14 promulgated thereunder.  His certification falsely stated that:  he had reviewed the report; based on his knowledge, the report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading; and based upon his knowledge, the financial statements and other financial information contained in the report fairly presented in all material respects the financial condition, results of operations and cash flows of the registrant.

75.     By reason of the foregoing, Crane violated, and unless enjoined will continue to violate, Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14], promulgated under Section 302 of the Sarbanes-Oxley Act of 2002.

**Fifth Claim for Relief**
**(Violation of Section 105(c)(7)(B) of the Sarbanes-Oxley Act of 2002 By Crane)**

76.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 61 above as if set forth fully herein.

77.     In January 2011, Crane was barred by the PCAOB from being an associated person of a registered accounting firm, or being associated with any issuer of U.S. registered stock in a financial management or accounting capacity.  In response, Crane sought permission from the PCAOB to remain as Subaye's CFO for two more months.  The PCAOB denied this request, but Crane remained the CFO of Subaye, an issuer, until March 2011.

78.     As a result, Crane, a person who was suspended or barred from being associated with a registered public accounting firm, remained associated with an issuer in an accountancy or a financial management capacity, without the consent of the  PCAOB or the Securities and Exchange Commission.

79.     As a result, Crane has violated and, unless enjoined, will continue to violate, Section 105(c)(7)(B) of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7215(c)(7)(B)].

**Sixth Claim for Relief**
**(Violation of Section 13(a) of Exchange Act and**
**Rules 12b-20, 13a-1, and 13a-11 By Subaye)**

80.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 61 above as if set forth fully herein.

81.     Subaye's  reports to the Commission on Forms 10-K  and 8-K covering fiscal year 2010 materially misstated the company's revenue and marketing expenses and contained material misrepresentations about the company's business, including failing to disclose related parties, claiming paying customers the company did not have, and representing that the company had a cloud computing business.  Specifically, these fraudulent reports included the

Form 10-K filed on December 22, 2010 for fiscal year 2010, and the Form 8-K/A filed on January 26, 2011.  Subaye thus failed to file with the Commission such financial reports as the Commission has prescribed, and Subaye failed to include, in addition to the information expressly required to be stated in such reports, such further material information as was necessary to make the statements made, in light of the circumstances in which they were made, not misleading.

82.    As a result, Subaye violated Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 12b-20, 13a-1, and 13a-11 thereunder [17 C.F.R. §§240.12b-20, 240.13a-1, 240.13a-11].

## Seventh Claim for Relief

**(Aiding and Abetting Subaye's Violation of Section 13(a) of Exchange Act and Rules 12b-20, 13a-1, and 13a-11 By Crane)**

83.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 61 above as if set forth fully herein.

84.    Subaye's  reports to the Commission on Forms 10-K  and 8-K covering fiscal year 2010 materially misstated the company's revenue and marketing expenses and contained material misrepresentations about the company's business, including failing to disclose related parties, claiming paying customers the company did not have, and representing that the company had a cloud computing business.  Specifically, these fraudulent reports included the Form 10-K filed on December 22, 2010 for fiscal year 2010, and the Form 8-K/A filed on January 26, 2011.  Subaye thus failed to file with the Commission such financial reports as the Commission has prescribed, and Subaye failed to include, in addition to the information expressly required to be stated in such reports, such further material information as was necessary to make the statements made, in light of the circumstances in which they were

made, not misleading.  As a result, Subaye violated Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 12b-20, 13a-1, and 13a-11  [17 C.F.R. §§240.12b-20, 240.13a-1, 240.13a-11].

85.    As set forth above, Crane signed Subaye's materially misleading public filings, and he knew, or was reckless in not knowing, that those public filings contained false and misleading statements about Subaye's revenues, business, number of employees, and number of paying customers.

86.    Crane provided knowing and substantial assistance to Subaye in making materially misleading public filings.

87.    As a result, Crane aided and abetted Subaye's violations of Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 12b-20, 13a-1, and 13a-11 thereunder [17 C.F.R. §§240.12b-20, 240.13a-1, 240.13a-11].

**Eighth Claim for Relief**
**(Violation of Section 13(b)(2)(A) of Exchange Act By Subaye)**

88.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 61 above as if set forth fully herein.

89.    Subaye maintained false and misleading books, records, and accounts which, among other things, materially overstated the company's revenue for fiscal year 2010 by improperly recording as assets funds claimed to have been advanced as marketing expenses.  Its books, records, and accounts thus failed accurately and fairly to reflect the transactions and disposition of the assets of Subaye.

90.    As a result, Subaye violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §78m(b)(2)(A)].

## Ninth Claim for Relief
## (Aiding and Abetting Subaye's Violation of Section 13(b)(2)(A) of Exchange Act By Crane)

91.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 61 above as if set forth fully herein.

92.     Subaye maintained false and misleading books, records, and accounts which, among other things, materially overstated the company's revenue for fiscal year 2010 by improperly recording as assets funds claimed to have been advanced as marketing expenses.   Its books, records, and accounts thus failed accurately and fairly to reflect the transactions and disposition of the assets of Subaye.  As a result, Subaye violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §78m(b)(2)(A)].

93.     Crane was aware that the funds claimed to have been advanced to agents were not under Subaye's control and that the company had no bank or other records to verify the existence or whereabouts of those funds.  He knew or was reckless in not knowing that Subaye's books, records, and accounts were false and misleading and failed accurately and fairly to reflect the transactions and disposition of the assets of Subaye.

94.     Crane provided knowing and substantial assistance to Subaye in maintaining false and misleading books, records and accounts.

95.     As a result, Crane aided and abetted Subaye's violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §78m(b)(2)(A)].

## Tenth Claim for Relief
## (Violation of Section 13(b)(2)(B) of the Exchange Act By Subaye)

96.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 61 above as if set forth fully herein.

97.     Subaye failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that Subaye's transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

98.     As a result, Subaye has violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. §78m(b)(2)(B)].

### Eleventh Claim for Relief
**(Aiding and Abetting Subaye's Violation of Section 13(b)(2)(B) of the Exchange Act By Crane)**

99.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 61 above as if set forth fully herein.

100.    Subaye failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that Subaye's transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

101.    As a result, Subaye has violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. §78m(b)(2)(B)].

102.    Crane was unable to provide supporting documentation to auditors to support claimed marketing expenses and third-party agent revenues, and admitted to auditors that Subaye lacked control over those funds.  He knew, or was reckless in not knowing, that Subaye had not devised and maintained a system of internal accounting controls sufficient to provide reasonable assurances that Subaye's transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

103.     Crane provided knowing and substantial assistance to Subaye in failing to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions at Subaye were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

104.     As a result, Crane aided and abetted Subaye's violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. §78m(b)(2)(B)].

**Twelfth Claim for Relief**
**(Aiding and Abetting Subaye's Violations of Section 10(b) of the Exchange Act And Rule 10b-5 thereunder)**

105.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 61 above as if set forth fully herein.

106.     By reason of the foregoing, Subaye, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail:  (a) has employed or is employing devices, schemes, or artifices to defraud; (b) has made or is making untrue statements of material fact or has omitted or is omitting to state material fact(s) necessary to make the statements made not misleading; or (c) has engaged or is engaging in acts, practices, or courses of business which operate as a fraud or deceit upon certain persons.

107.     By reason of the foregoing, Crane aided and abetted Subaye's violations of Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.      Enter a permanent injunction restraining Defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of  Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)];

B.      Require Crane to disgorge his ill-gotten gains and losses avoided, plus pre-judgment interest;

C.      Require Crane to pay appropriate civil monetary penalties pursuant to  Section 21(d)(3) of the Securities Exchange Act [15 U.S.C. § 78u(d)(3)];

D.      Impose an officer and director bar against Crane pursuant to Section 21(d)(2) of the Exchange Age [15 U.S.C. § 78u(d)(4)];

E.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F.      Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

By its attorneys,

Caitlyn M. Campbell
Senior Counsel
CampbellCa@sec.gov
33 Arch Street, 23rd Floor
Boston, Massachusetts  02110
Telephone:  (617) 573-8903
Facsimile:  (617) 573-4590

Dated:  May  8 , 2013

Of Counsel:
Rachel E. Hershfang*
        Senior Trial Counsel
        HershfangR@sec.gov
Martin F. Healey*
        Regional Trial Counsel
        HealeyM@sec.gov
John J. Kaleba *
        Senior Counsel
        KalebaJ@sec.gov
SECURITIES AND EXCHANGE COMMISSION
33 Arch Street, 23rd Floor
Boston, Massachusetts  02110
Telephone:  (617) 573-8900
Facsimile:  (617) 573-4590

*Not admitted in the S.D.N.Y.