UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                        Plaintiff,

         -against-

SUBAYE, INC. and JAMES T. CRANE,

                      Defendants.
------------------------------------------------------------x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _2-4-14_

13 Civ. 3114 (PKC)

MEMORANDUM
AND ORDER

CASTEL, U.S.D.J.

       The United States Securities and Exchange Commission ("SEC") brings this

action for twelve violations of the Securities and Exchange Act of 1934 ("Exchange Act"), rules

promulgated thereunder, and the Sarbanes-Oxley Act of 2002 against Subaye Inc. ("Subaye"), a

China-based company formerly listed on the NASDAQ exchange, and James T. Crane, Subaye's

former CFO.  The SEC's allegations relate to the collapse of Subaye.  After the exposure of

alleged fraud, the value of the company's stock fell precipitously from a market capitalization of

over $200 million in 2010 to a near-worthless level by mid-2011.  The complaint charges Crane

with securities fraud, accounting violations, violations of Exchange Act rules governing SEC

filings, and aiding and abetting the securities law violations of Subaye.  Defendant Crane moves

to dismiss the securities fraud and aiding and abetting claims.  For the reasons set forth below,

defendant's motion is denied.

BACKGROUND

    A.  Subaye and Crane

        The following facts are derived from the SEC's complaint and are accepted as true for the purposes of this motion. All reasonable inferences are drawn in favor of the SEC, as the non-movant.

        Subaye is a Delaware corporation whose primary operations were in China. (Complaint ¶ 18) From 2008 through 2010, Subaye claimed to be in the business of providing advertising and entertainment media services to small-to-medium businesses in China; beginning in September 2010, the company claimed to have discontinued this business and shifted to a "bundled cloud computing" business model offering a combined package of online video and cloud computing services. (Complaint ¶ 3) Subaye's stock trades in the United States securities markets, currently in the over-the-counter market; from March 15, 2010 through November 11, 2011, the company's stock was listed on the NASDAQ exchange. (Complaint ¶ 18) As a registered public company, Subaye was required to file periodic and other reports with the SEC, including audited quarterly and annual financial statements. Id.

        James Crane was a Massachusetts-licensed CPA and the founder of J. Crane CPA, P.C., a Massachusetts-based accounting firm formerly registered with the Public Company Accounting Oversight Board ("PCAOB"). (Complaint ¶ 19) Crane served as the CFO of Subaye from October 29, 2007 until March 10, 2011, and lived in China during his employment there. Id. Crane is currently believed to reside in California. Id.

        As required, Subaye filed annual and quarterly reports with the SEC describing its business and financial condition. (Complaint ¶ 20) These reports were drafted and signed by Crane. Id. As part of each Form-10-K, Crane filed a certification, pursuant to Exchange Act

rules 13a-14 and 15a-14(a), that, based on Crane's knowledge, the form "did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." (Complaint ¶ 25)  These certifications also stated that, based on Crane's knowledge, "the financial statements and other financial information contained in each report fairly presented in all material respects the financial condition, results of operations[,] and cash flows of Subaye." Id.

In compliance with SEC requirements, Subaye retained an independent auditor to conduct annual audits and quarterly reviews for each of its financial statements. Id. Until late 2010, DNTW Chartered Accounts, LLP ("DNTW"), a Canada-based accounting firm, filled this role. Id. According to DNTW, Crane was the only Subaye employee fluent in English, and DNTW relied almost exclusively on communications with Crane in conducting quarterly reviews and annual audits of Subaye. Id. Crane was responsible for Subaye's SEC filings for fiscal years 2008, 2009, and 2010. (Complaint ¶ 20)

The descriptions of Subaye's business provided in their SEC filings changed dramatically from year to year. In its 2008 Form 10-K, Subaye (then known as MyStarU.com, Inc.) described its website, www.subaye.com, as a "premier provider of online video in China," with 34,545 members paying a monthly membership fee of about $100. (Complaint ¶ 22) The company reported total revenues of over $29 million. Id. In its 2009 Form 10-K, Subaye claimed to be developing "what Subaye believes is the first online shopping mall in the world that will utilize 3D imaging throughout the online customer interface." (Complaint ¶ 23) There, Subaye reported revenues of just under $48 million and claimed that it had 63,311 members. Id.

The company's 2010 Form 10-K indicated a drastic change in strategy, as Subaye stated that it had "fully committed" its business model to something it called a "second generation cloud computing product." (Complaint ¶ 26)  The company would "no longer offer Online Video as a separate product," instead offering online video as part of its new "Bundled Cloud Computing Product."  Id.  Subaye reported revenues of $39.1 million for fiscal year 2010 and represented that it had increased its monthly fee to $410.  Id.  Subaye also reported that it had increased the size of its sales force from 212 representatives in September 2009 to 1,405 in September 2010.  (Complaint ¶ 28)

On January 26, 2011, Crane filed an Amended Form 8-K/A with the SEC, attaching a presentation that Crane reported was prepared for an investor conference. (Complaint ¶ 29)  This presentation repeated claims made in the 2010 Form 10-K, including Subaye's revenues, number of employees, and marketing expenses.  Id.  The presentation also claimed that the company had over 14,600 customers and projected revenues of $71.3 million for fiscal year 2011.  Id.

B.  Subaye's Disputes with its Auditors

On December 23, 2010, the same day that it filed its Form 10-K for fiscal year 2010, Subaye announced in a press release that it had dismissed DNTW and replaced the firm with Pricewaterhouse Cooper Hong Kong ("PWC HK").  (Complaint ¶ 30)  The dismissal followed two exchanges between Crane and DNTW regarding the treatment of certain accounting entries; on behalf of Subaye, Crane sought to have these items listed as assets, while DNTW ultimately required Subaye to characterize them as expenses.

The more recent of these two exchanges involved a $22.1 million "marketing expense" reported in the 2010 Form 10-K.  Crane had previously told DNTW that $18.8 million of cash collected from customers was being held by Subaye's third party sales agents to be used for future marketing expenses; he sought to characterize this money as an asset.  (Complaint ¶ 32)  When DNTW requested proof of the existence of this cash, Crane could not provide any bank statements; instead, he produced the employment contracts of the third party sales agents.  Id.  In response to DNTW's questions seeking to corroborate the existence of the cash and Subaye's control over it, Crane explained that "There is no control over the accounts.  This is something I suggested they do but confirmed yesterday that it was not agreed to by the agents."  Id.  Crane ultimately agreed with DNTW that the $18.8 million could not be called cash under the circumstances; the $18.8 million was therefore treated as part of the company's marketing expenses in the 2010 Form 10-K.  Id.  Subaye never issued any restatement of its past financials, which had treated this item as an asset called "cash held in trust."  (Complaint ¶ 32)

Prior to this dispute, Crane and DNTW had communicated at length regarding certain inventory deposits.  The audited financial statements accompanying Subaye's 2009 Form 10-K reported $8.1 million of "Deposits for Purchase of Inventorial Assets" as an asset on the company's balance sheet.  (Complaint ¶ 35)  Crane told DNTW that these deposits related to the future launch of the company's online 3D mall, that they were intended to ensure Subaye's ability to maintain an inventory once the mall launched, and that they were refundable.  Id.  However, by the fourth quarter of 2010 the deposits were reduced to $2.8 million; Subaye claimed that $3.4 million of the deposits had been written off, with only $1.9 million having been refunded.  (Complaint ¶ 36)  The remaining $2.8 million was treated as an expense in the 2010 Form 10-K, at the insistence of DNTW.  Id.  Again, the prior financials (and future

financials incorporating information from past filings) were never restated to correct these items. (Complaint ¶ 38)

After the change in auditors in December 2010, PWC HK began its engagement with a review of Subaye's financials in January 2011. (Complaint ¶ 44). On February 14, 2011, Subaye filed a Form 12B-25 with the SEC, stating that because of delays in compiling their accounting records the company would be late in filing its 10-Q report for the quarter ending on December 31, 2010. (Complaint ¶ 45) In conducting its review, PWC HK emphasized in its communications with the Subaye audit committee its inability to verify several key aspects of the company's business: (1) Subaye's customer base, (2) services rendered by Subaye to its customers, (3) marketing and promotional activities that Subaye claimed its sales force had engaged in, and (4) the aforementioned cash payments claimed to have been made by sales representatives to Subaye's bank accounts. (Complaint ¶ 46) PWC HK's efforts to obtain support for these claims proved unsuccessful, as did its efforts to conduct site visits with three selected sales agents. Id. PWC HK also questioned several relationships between Subaye's customers and vendors not disclosed in the company's SEC filings, and further noted that there was no evidence that the company had paid business taxes for services rendered in China. Id.

While PWC HK's review was underway, on January 19, 2011 the PCAOB filed an action against Crane and his audit firm. (Complaint ¶ 40) The action resulted from the PCAOB's unsuccessful efforts to inspect Crane's firm, and his failure to file required reports and pay fees. Id. Crane agreed to settle the claims without admitting or denying the allegations charged, and consented to the entry of an order permanently revoking his registration as a CPA and barring him from being an associated person of a registered public accounting firm. Id. Despite this settlement agreement, Crane remained in his position as the CFO of Subaye for

nearly two more months and continued to play an active role in the company's accounting and business. (Complaint ¶ 43) He appeared before investors in Florida to promote Subaye on January 25, 2011, and signed an Amended Form 8-K/A on behalf of the company on January 26, 2011. Id.

On February 22, 2011, NASDAQ notified Crane that, because of its failure to timely file its 10-Q report for quarter ending December 31, 2010, Subaye was no longer in compliance with the NASDAQ listing rules and had 60 calendar days to submit a plan to regain compliance. (Complaint ¶ 52)   Crane resigned as CFO on March 10, 2011. (Complaint ¶ 53) Shortly thereafter, on April 1, 2011, PWC HK resigned as Subaye's independent auditor, citing concerns including each of those described above. (Complaint ¶ 50)

C. Subaye's Change in Management and the Discovery of Fraud

In an effort to restore compliance with NASDAQ rules, Subaye management hired Alexander Holtermann, a German businessman who had facilitated a transaction for the company in 2010. (Complaint ¶ 55) Holtermann was initially hired to find a new auditor for Subaye and to develop a plan for NASDAQ recompliance, though his efforts to achieve both of these goals proved unsuccessful. Id. On May 12, 2011, Subaye filed a Form 8-K announcing that Holtermann had been appointed CEO, replacing Zhiguang Cai, who resigned his position. (Complaint ¶ 58) The Form 8-K was signed by Alan Lun, the president of Subaye, who also resigned his position several days later. (Complaint ¶¶ 56-57)

In early June 2011, a month after his appointment as CEO, Holtermann made his first visit to Subaye's corporate headquarters in University City, Guangzhou, China. (Complaint ¶ 58) The address he was given turned out to be that of a hall of student offices; finding a

Subaye sign near a locked office, Holtermann knocked but received no response. Id. From a
nearby balcony, Holtermann looked into the office's windows and saw two rooms containing no
people and minimal furniture. Id.

Around the same time, Holtermann hired a new CFO and sought Subaye's
financial records, assets, customer information, IT infrastructure, and employees. (Complaint ¶
59) In pursuit of these efforts, he met with his predecessor, Cai, and spoke with Lun. Id. After
several weeks, Holtermann and his new CFO received a small stack of documents that were said
to represent all of the company's financial records. Id. The records contained no evidence of a
cloud computing business, or of any of the over one thousand employees that Subaye had
claimed to have. Id. Holtermann was also provided with a purported list of the company's
customers; at his direction, agents placed phone calls to each of the 2,500 customers listed, and
only two identified themselves as paying customers of Subaye. (Complaint ¶ 60) His search for
the company's assets turned up only approximately $200,000. (Complaint ¶ 8) Based on his
findings, Holtermann concluded that "Subaye was a scam." (Complaint ¶ 61)

The SEC commenced this action against Subaye and Crane. On May 15, 2013,
Subaye and the SEC jointly submitted, and the Court entered, a Final Judgment as to Subaye
pursuant to which Subaye consented to certain relief without admitting or denying the allegations
in the complaint. (Dkt. No. 8)

ANALYSIS

   A.  Legal Standard

To survive a motion to dismiss for failure to state a claim upon which relief can
be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In assessing a complaint, courts must draw all reasonable inferences in favor of the non-movant and accept as true all the factual allegations in the complaint.  See In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007) (per curiam).  Although pleadings are to be liberally construed, "bald assertions and conclusions of law will not suffice," and "[t]he pleadings must create the possibility of a right to relief that is more than speculative." Spool v. World Child Intern. Adoption Agency, 520 F.3d 178, 183 (2d Cir. 2008) (citations and quotations omitted).

In addition, Rule 9(b) of the Federal Rules of Civil Procedure imposes a heightened pleading standard on complaints alleging securities fraud. Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000).  Under that Rule, parties alleging fraud must "state with particularity the circumstances constituting fraud." Rule 9(b), Fed R. Civ. P.  A plaintiff satisfies Rule 9(b) by: (1) specifying the fraudulent statements, (2) identifying the speaker, (3) stating where and when the statements were made, and (4) explaining why the statements were fraudulent. Novak, 216 F.3d at 306 (citation omitted).  Rule 9(b) further provides that "malice, intent, knowledge and other condition of mind of a person may be averred generally." Rule 9(b).

### B.  Securities Fraud

Section 10(b) of the Exchange Act, in relevant part, makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).  Rule 10b–5 implements Section 10(b). 17 C.F.R. § 240.10b-5.

To violate section 10(b) and rule 10b-5, "a party must have (1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter, (3) in connection with the purchase or sale of securities." SEC v. Pentagon Capital Mgmt. PLC, 725 F.3d 279, 285 (2d Cir. 2013) (citation and quotation omitted). "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b–5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000) (citing Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988)). Whether an alleged statement or omission is material depends on the relevant circumstances of the case. Id. at 162.

In order to adequately plead scienter in the context of a claim for securities fraud, a plaintiff must "allege facts that give rise to a strong inference of fraudulent intent." Novak, 216 F.3d at 306.[1] A "strong inference" of fraudulent intent "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Id. at 307 (citation and internal quotation marks omitted). The Second Circuit has explained that such an "inference may arise where the complaint adequately alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud, (2) engaged in deliberately illegal behavior, (3) knew facts or had access to information suggesting that their public statements were not accurate, or (4) failed to check information they had a duty to monitor." Id. at 311 (internal citations omitted). The Supreme Court has held that, in order to

---

[1] Novak was decided under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which does not apply to this SEC enforcement action. See 15 U.S.C. § 78u-4(a)(1) ("The provisions of this subsection shall apply in each private action arising under this chapter."). Nonetheless, the decision also addresses the pre-PSLRA pleading standard for scienter and determines that, with the exception of the PSLRA's requirement that private plaintiffs state "with particularity" facts giving rise to an inference of scienter, the standard remains the same. Novak, 216 F.3d at 310-11 ("[W]e believe that the enactment of paragraph (b)(2) did not change the basic pleading standard for scienter in this Circuit (except by the addition of the words 'with particularity').").

qualify as "strong," an "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007).

Reckless conduct is defined as, "at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Novak, 216 F.3d at 308 (citation omitted). Further, "[a]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness." Id. (citing Chill v. General Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996)).

With respect to the third element, whether the statement or omission was made "in connection with the purchase or sale of securities," the phrase "in connection with" is broadly construed. In re Carter-Wallace Sec. Litig., 150 F.3d 153, 156 (2d Cir. 1998). The statement or omission need only be "of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell a corporation's securities." Id. (citations omitted).

Crane has not challenged the adequacy of the SEC's pleading of the element of materiality. Crane's statements in SEC filings and in investor presentations described a company that, simply put, did not exist in the form reported. His statements regarding, for instance, the size of the company's customer base, its number of employees, its annual revenues, and the status of certain purported assets would each be considered significant by a reasonable investor making an investment decision. See Ganino, 228 F.3d at 161. The statements are also material in quantitative terms. See id. at 162-63. Crane reported in Subaye's SEC filings that the

company had a sales force of 1,405 that controlled $22.1 million of Subaye's cash, an amount equal to 56.5% of the company's $39.1 million of annual revenues reported in 2010. In reality, the sales force was far smaller or nonexistent, and all but $200,000 of the company's assets was ultimately never accounted for. Similarly, the company's filings reported many thousands of customers; PWC HK was never able to confirm the existence of these customers, and Subaye's new CEO was only able to confirm the existence of two.

Also, Crane does not dispute that these statements and omissions were made in connection with the purchase or sale of securities. Statements made in official SEC filings are routinely relied upon by investors making investment decisions regarding the securities of a public company, and are therefore made "in connection with" securities transactions.

Crane primarily argues that the SEC has failed to adequately allege the element of scienter. According to the facts alleged by the SEC, despite his inability to speak Chinese Crane served as the CFO of Subaye for three and a half years, presented information about the company to investors and auditors, certified information about the company in SEC filings, and played an integral role in the company's accounting practices in at least two major auditor disputes. Moreover, the complaint alleges that Crane was the sole employee of Subaye responsible for communicating with the company's auditors. There is no indication that he relied on the work of others in this capacity, or in his capacity as the drafter and certifier of Subaye's SEC filings. To the contrary, each quarterly and annual report filed by Crane on behalf of Subaye contains an express certification signed by Crane, attesting to the accuracy of the statements therein, stating that the information in each report "fairly present[s] in all material respects the financial condition, results of operations and cash flows of [Subaye]," and stating that Crane himself is "responsible for establishing and maintaining disclosure controls and

procedures . . . for [Subaye]" to ensure the accuracy and reliability of the information in the report.  See, e.g., Subaye, Inc. Form 10-K, Ex. 31.2 (Dec. 23, 2010).

      The SEC alleges that "Subaye had no verifiable revenues to back up its claims of customers; the people it claimed as customers had no such relationship to the company; and it lacked the infrastructure to support its claimed cloud computing service."  (Complaint ¶ 8)  Given Crane's role and the magnitude of the fraud, the facts alleged "constitute strong circumstantial evidence of conscious misbehavior or recklessness."  Novak, 216 F.3d at 307.  The circumstantial evidence here appears strong enough to support an inference of knowledge; at the very least, the SEC's allegations demonstrate "[a]n egregious refusal to see the obvious, or to investigate the doubtful" giving rise to an inference of recklessness.  Id. at 308.

      Crane suggests that he functioned as a mere conduit of information—i.e., that other Subaye employees provided him with information, and his only responsibility was to mechanically convey that information to the company's auditors and incorporate it into the company's SEC filings.  Crane, of course, remains free to defend the case at trial.  But Crane's fact-based arguments are not properly asserted on a motion to dismiss.  The facts alleged by the SEC supporting a strong inference of scienter are "at least as compelling as [the] opposing inference of nonfraudulent intent" advanced by Crane.  See Tellabs, 551 U.S. at 314.

      Relying on Geiger v. Solomon-Page Group, Ltd., 933 F.Supp. 1180, 1191 (S.D.N.Y. 1990), Crane argues that the SEC has not alleged scienter because he did not derive any concrete personal benefit from the alleged fraud.  However, as that case makes clear, pleading "motive" in the form of a concrete personal benefit derived from an alleged fraud is merely one possible method of demonstrating scienter.  Id. at 1188; see also Novak, 216 F.3d at

307.  As discussed above, the SEC has adequately alleged facts to support a strong inference of

scienter on Crane's part; as such, it is unnecessary to reach the issue of motive.

Crane's separate argument that the SEC's complaint impermissibly alleges "fraud

by hindsight" is meritless.  It is true that the Second Circuit has rejected allegations of fraud by

hindsight, i.e. "allegations that defendants should have anticipated future events and made

certain disclosures earlier than they actually did . . . ."  Novak, 216 F.3d at 309.  It is also true

that "[m]anagement's optimism that is shown only after the fact to have been unwarranted does

not, by itself, give rise to an inference of fraud."  Stevelman v. Alias Research, Inc., 174 F.3d 79,

85 (2d Cir. 1999).  But these principles are inapplicable to nearly all of the allegedly fraudulent

statements identified by the SEC.  With the single exception of the projection of Subaye's

revenues for fiscal year 2011 provided in the January 26, 2011 Amended Form 8-K/A and in a

related investor presentation, see Complaint ¶ 29, none of the allegedly fraudulent statements

was forward-looking or anticipatory in any sense.  Rather, each was either a statement of the

company's present financial and business condition or a report of the company's operating

results for the preceding quarter or fiscal year.  Accordingly, the statements identified by the

SEC do not allege "fraud by hindsight."

The SEC's complaint also satisfies the heightened pleading standards for

allegations of fraud applicable under Rule 9(b), and Crane's argument that the SEC's allegations

of fraud are broad and conclusory is without merit.  The complaint identifies numerous specific

allegedly fraudulent statements made by Crane in the SEC filings that he drafted, signed, and

filed on specified dates.[2]  See, e.g., Complaint ¶¶ 20-29, 32, 35-36.  With respect to allegedly

---

[2] In Janus Capital Group, Inc. v. First Derivative Traders, 131 S.Ct. 2296, 2302 (2011) the Supreme Court limited
the scope of liability under Exchange Act section 10(b) and rule 10b-5 by holding that "the maker of a statement is
the person or entity with ultimate authority over the statement, including its content and whether and how to
communicate it."  This limitation does not preclude Crane's liability based on the fraudulent statements identified

fraudulent statements made by Crane outside of SEC filings, the SEC has identified the date and location of the statements made. See, e.g., Complaint ¶¶ 29-32, 35.

As for the fraudulent nature of the statements, the SEC's complaint alleges that each of the statements identified was fraudulent when made because the company did not exist in any form remotely resembling what was reported. Instead of a profitable business with tens of thousands of customers, millions of dollars in assets and revenues, and a sizable employee base, Subaye turned out to be a business with an empty office in a student building, two confirmed customers, almost no employees, no revenues, and only $200,000 in cash. All of this came to light fewer than five months after the most recent SEC filing identified in the Complaint. The SEC's complaint is replete with statements from annual, quarterly, or other reports filed with the SEC, which were materially false and misleading. (Complaint ¶¶ 24, 26, 28, 29, 31, 36) It more than amply identifies with particularity the allegedly false statements.

## C.  Aiding and Abetting

Under section 20(e) of the Exchange Act, in actions brought by the SEC "any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided."[3]  15 U.S.C. § 78t(e).  To establish liability for aiding and abetting in the

---

here. With respect to statements in Subaye's SEC filings, the SEC has alleged that Crane not only drafted and prepared statements in the filings—he also signed a certification attached to each filing in which he personally attested to, inter alia, the accuracy and completeness of the statements contained therein.

[3] The Dodd-Frank Act of 2010, which became effective on July 21, 2010, added the words "or recklessly" to section 20(e) of the Exchange Act.  Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, § 929O (codified at 15 U.S.C. §78t(e)).  This amendment of the statutory scienter requirement thus applies to statements made after the effective date, such as those in the 2010 Form 10-K and the January 26, 2011 Form 8-K/A, but not to statements made before the effective date, such as statements made in the 2008 and 2009 10-K forms.  Because the aiding and abetting claims expressly reference only filings and conduct occurring after the

context of a securities law violation, a plaintiff must show: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." SEC v. DiBella, 587 F.3d 553, 566 (2d Cir. 2009) (internal citations omitted). "[T]he three requirements cannot be considered in isolation from one another." Id. "Satisfaction of the [knowledge] requirement will . . . depend on the theory of primary liability[,] and . . . there may be a nexus between the degree of [knowledge] and the requirement that the alleged aider and abettor render 'substantial assistance.' " Id.

To satisfy the "substantial assistance" element of aiding and abetting, the SEC need not show that a defendant proximately caused the harm on which the primary violation was predicated. SEC v. Apuzzo, 689 F.3d 204, 213 (2d Cir. 2012). Rather, "the SEC must show that the defendant 'in some sort associated himself with the venture, that he participated in it as something that he wished to bring about, and that he sought by his action to make it succeed.' " Id. at 206 (quoting United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938) (Hand, J.)).

The SEC brings four claims of aiding and abetting liability against Crane. Claim Seven charges Crane with aiding and abetting Subaye's primary violations of section 13(a) of the Exchange Act and rules 12b-20, 13a-1, and 13a-11, for deficiencies and omissions in the filing of the company's Form 10-K filed on December 22, 2010 and the Form 8-K/A filed on January 26, 2011. Claim Nine charges Crane with aiding and abetting Subaye's primary violations of section 13(b)(2)(A) of the Exchange Act, for maintaining misleading books and records. Claim Eleven charges Crane with aiding and abetting Subaye's primary violations of section 13(b)(2)(B), for failing to maintain a system of internal accounting controls. Though none of these three primary

effective date (or conduct that was ongoing after the effective date), the added "reckless" language applies to each of the four counts. See Complaint ¶¶ 84, 92, 102.

violations has a scienter requirement, in order to state claims for aiding and abetting liability the SEC must nonetheless adequately allege that Crane knowingly or recklessly provided Subaye with substantial assistance in committing the alleged violations.  The final claim against Crane, Claim 12, charges him with aiding and abetting Subaye's securities fraud primary violation under section 10(b) of the Exchange Act and rule 10b-5 promulgated thereunder.

As an initial matter, the SEC has sufficiently alleged the existence of each of the four primary violations.  Corporations can act only through their employees and agents.  Suez Equity Investors, LP v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d Cir. 2001).  The Complaint adequately alleges that Subaye, through its agents (which included Crane, its CFO), made deficient and inadequate SEC filings, maintained misleading books and records, failed to maintain an adequate system of internal accounting controls, and, as discussed above, made materially fraudulent statements in connection with the purchase and sale of securities.  Further, Crane does not challenge the adequacy of the SEC's pleading of his violations of Exchange Act rules 13b2-1 (falsification of books, records, or accounts, 17 C.F.R. § 240.13b2-1), 13b2-2 (making materially false or misleading statements or omissions to accountants in connection with an audit or SEC filing, 17 CFR § 240.13b2-2), and 13a-14 (signing a false certification in an SEC filing, 17 CFR § 240.13a-14).  The conduct charged in each of these violations significantly overlaps with the conduct charged in the primary violations alleged in each of the four aiding and abetting charges, and also alleges Crane's knowledge of Subaye's primary violations.

The Complaint adequately alleges that Crane provided substantial assistance to Subaye in carrying out the primary violations alleged.  With respect to each alleged primary violation, Crane associated himself with the venture, participated in it as something that he wished to bring about, and sought by his action to make it succeed.  Specifically, the SEC has

alleged that Crane was responsible for drafting and certifying each of Subaye's SEC filings during the relevant period.  Crane was allegedly the sole Subaye employee who communicated with the company's auditors in preparation for filing required reports.  Crane was also the exclusive agent of Subaye involved in the two alleged accounting disputes with the company's auditor, DNTW.  These disputes revealed significant accounting deficiencies, and nearly all of the funds at issue in these disputes were unaccounted for when Subaye's new CEO took over the company.  Moreover, despite his eventual concession that the money purportedly in the control of Subaye's sales agents could not be treated as an asset, Crane took no steps to restate prior SEC filings that had inaccurately listed this money as an asset.  Nor did Crane do so for the money inaccurately reported as a refundable inventory deposits.  The SEC has adequately alleged that Crane, a central figure in these two accounting disputes, was associated with Subaye's deficient systems of internal accounting controls, and that his failure to take any steps to improve these controls helped to bring about Subaye's primary violation on that count.

With respect to the "knowledge" requirement, the SEC has adequately alleged that Crane knew or was reckless in not knowing about each of the primary violations.  As discussed above, Crane knew or was reckless in not knowing that the statements he made on behalf of Subaye to auditors and investors and in SEC filings were fraudulent; this establishes his knowledge with respect to Claims 7 and 12.  And Crane's alleged involvement in the marketing dispute relating to the treatment of marketing expenses in Subaye's 2010 Form 10-K adequately demonstrates his knowledge of the company's maintaining false or misleading books and records and failure to maintain a system of internal accounting controls.

Crane argues that if the SEC's allegations are held to adequately plead aiding and abetting liability, then every time a corporation's CFO provides information to a company's

auditors that CFO will be found to have substantially assisted his company's alleged securities law violations. This argument disregards the facts and context alleged by the SEC. The complaint alleges that Crane himself was the sole Subaye employee to interact with the company's auditors, and that he "drafted, signed, and certified" the statements in the company's SEC filings. (Complaint ¶ 26) The conduct underlying the primary violations charged in Claims Seven and Twelve—signing the 2010 Form 10-K and the January 2011 Form 8-K/A despite their containing false and misleading statements, and making false and misleading statements in those filings and elsewhere—supports claims for both primary liability and aiding and abetting liability against Crane. Crane is responsible for these actions both in his individual capacity and in his capacity as an agent of Subaye. As for Claims Nine and Eleven, the conduct alleged there— Subaye's maintaining false and misleading books and records, and failing to maintain a system of internal accounting controls—was squarely within Crane's alleged range of responsibilities as CFO, as well as within the duties that Crane expressly declared himself responsible for in each certification form he submitted in Subaye's SEC filings. See, e.g., Subaye, Inc. Form 10-K, Ex. 31.2, ¶¶ 4, 5 (Dec. 23, 2010). In short, Crane's argument fails because he was not simply merely a CFO providing information to auditors: he was personally involved in or responsible for the securities law violations alleged. Under a regime permitting alternative pleading, there is nothing inconsistent with the SEC bringing securities law claims based on the same course of conduct under both primary and aiding and abetting theories of liability.

Thus, the SEC has adequately alleged that Crane knowingly or recklessly provided substantial assistance to Subaye's securities law violations, and has therefore stated claims for aiding and abetting liability against Crane.

<u>CONCLUSION</u>

        For the foregoing reasons, defendant's motion to dismiss Claims One, Seven, Nine, Eleven, and Twelve (Dkt. No. 21) is DENIED.


        SO ORDERED.

                                          P. Kevin Castel
                                United States District Judge

Dated: New York, New York
        February 4, 2014